## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CINDY FRYER,

                **PLAINTIFF,**

    **v.**

ENDO PHARMACEUTICALS, INC.,

                **DEFENDANT.**

**CIVIL ACTION NO.**
**JURY TRIAL DEMANDED**

## COMPLAINT AND JURY DEMAND

Plaintiff Cindy Fryer by and through her attorneys, Bell & Bell, LLP, hereby files the following Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1.    This is an action for an award of damages, attorneys' fees and other relief on behalf of Plaintiff Cindy Fryer , who was formerly employed by Defendant Endo Pharmaceuticals, Inc. ("Endo").  Ms. Fryer has been harmed by Defendant's sex and age discrimination, and by Defendant's retaliation for complaints about discrimination.

2.    This action arises under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq. ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA").

## JURISDICTIONAL STATEMENT

3.    This Court has original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4.     The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

5.     This Court has supplemental jurisdiction over any Pennsylvania state law claims pursuant to 28 U.S.C. § 1367.

6.     All conditions precedent to the institution of this suit have been fulfilled.  On November 10, 2017, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint with the Pennsylvania Human Relations Commission ("PHRC").  On May 29, 2018, the EEOC issued a Notice of Right to Sue to Plaintiff.  This action has been filed within ninety (90) days of Plaintiff's receipt of said Notice.[1]

## VENUE

7.     This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b), because the claim arose in this judicial district.

## PARTIES

8.     Plaintiff Cindy Fryer is an adult female citizen who resides at 818 Lambs Road, Mullica Hill, New Jersey 08062.

9.     Defendant Endo Pharmaceuticals, Inc. is a business entity duly organized and existing under state law that has a place of business at 1400 Atwater Drive, Malvern, Pennsylvania 19355, where Plaintiff was employed.

---

[1] It has not yet been one year since the dual-filing with the PHRC, but Plaintiff reserves the right to assert a claim under the Pennsylvania Human Relations Act when one year has elapsed.

10.   Ms. Fryer is fifty years old and within the class of individuals protected against discrimination and other unlawful employment practices by the ADEA.

11.   At all relevant times, Defendant is and has been an employer employing more than 500 employees.

12.   At all relevant times, Defendant acted by and through its authorized agents, servants and/or employees acting within the course and scope of their employment with Endo and in furtherance of Endo's business.

13.   At all times relevant hereto, Plaintiff Cindy Fryer was an "employee" of Defendant within the meaning of the laws at issue in this suit and is accordingly entitled to the protections of said laws.

14.   At all relevant times, Defendant Endo is and has been an "employer" and/or "person" as defined under the laws at issue in this suit, and is accordingly subject to the provisions of said laws.

**FACTS**

15.   Ms. Cindy Fryer is an adult female individual who was employed by Endo until her termination in 2017.

16.   Ms. Fryer was hired by Endo in or around January 2010 to serve as its Director, Treasury Planning, Analysis & Operations.

17.   On or around February 19, 2010, Fryer was awarded a stock option grant by Endo (the "2010 Grant").

18.   Throughout her employment with Endo, Ms. Fryer performed her duties in an exemplary manner, as she had throughout her career.

19. Indeed, in February of 2011, Ms. Fryer was promoted to Senior Director, Treasury Planning, Analysis & Operations.

20. Ms. Fryer made significant contributions to building Endo's 3rd party debt portfolio from less than $500 Million in 2010 when she was hired, to more than $8 Billion at the time of her wrongful termination.

21. Ms. Fryer was selected to receive Endo's 2014 President's Award, awarded to Endo's top ten of approximately 5,000 employees for exemplifying the company's key values while making significant contributions towards the advancement of its strategic goals and vision.

22. Ms. Fryer was awarded with significant bonus compensation as a result of her performance throughout her employment.

23. Despite her dedication, exemplary performance, and significant contributions to Endo's success, Ms. Fryer was subjected to discrimination and harassment on the basis of her gender and age, discriminatory pay and promotional opportunities, and was retaliated against because of complaints she raised regarding this discrimination and harassment.

24. During her employment, Ms. Fryer was discriminated against and harassed on the basis of her age and sex, was paid less than her younger, male counterparts performing equal work, and was repeatedly passed over for promotions on the basis of her age and gender.

25. Ms. Fryer was terminated as a result of age and sex discrimination and in retaliation for Ms. Fryer's complaints regarding discrimination and harassment.

26. Following her wrongful termination, Endo wrongfully revoked her severance, and defamed Ms. Fryer in retaliation for her complaints by indicating to third parties, falsely, that Ms. Fryer had defrauded Endo.

27.   In an effort to continue to retaliate against Ms. Fryer, Endo initiated litigation against Ms. Fryer, falsely accusing her of fraud and other wrongdoing.

28.   Endo has further retaliated by taking steps to attempt to interfere with Ms. Fryer's employment and ability to continue to earn a living.

29.   As a result of Endo's retaliatory conduct, Ms. Fryer has had to spend significant resources to defend herself against the baseless, and retaliatory allegations Endo has taken against her.

30.   In early 2010, shortly after the start of her employment with Endo, Ms. Fryer learned that younger, male employees hired at or around the same time she was had received significant stock bonuses.

31.   It was only after Ms. Fryer complained regarding this issue that she received a similar award, commensurate with the awards received by these other employees.

32.   In February 2011, Ms. Fryer was promoted to Senior Director by her immediate supervisor at the time - Vice President-Treasurer Karen Adler.

33.   Ms. Adler acknowledged at the time of Ms. Fryer's promotion that she had been "underleveled" when she joined Endo in 2010.

34.   At the same time, similarly situated younger males in Finance were promoted to the Vice President level.

35.   In February 2011, Ms. Adler was also promoted and later replaced by Mark Gottlieb, who was younger than Ms. Fryer, in the Vice President - Treasurer role.

36.   Ms. Fryer questioned why she was passed over for this promotion in favor of the younger, male, Mr. Gottlieb.

37.   In June of 2013, due to a reduction in force, Mr. Gottlieb was terminated.

38.  Rather than promote Ms. Fryer into the vacant Treasurer role, however, the company reevaluated the role and changed it from a Vice President level role to a Senior Vice President level role, effectively placing it out of reach for Ms. Fryer.

39.  Between June of 2013 and July of 2014, Ms. Fryer reported to three different individuals who filled the Treasurer role.

40.  First, in June 2013, Roberto Cuca, a colleague of CFO Alan Levin, filled the role.  In August of 2013, Mr. Cuca left and Karen Adler became the Treasurer again.

41.  In late 2013, Mr. Levin was replaced by Suky Upadhyay as CFO, and Ms. Adler was forced to leave the company in or around March of 2014 under unpleasant circumstances.  Ms. Adler was replaced as Treasurer by Andrew Saik, another younger, male employee.

42.  In 2014 and 2015, Mr. Upadhyay continued to expand the Finance team by hiring younger male employees to fill very senior level positions.

43.  Despite being passed over for the role of Treasurer for years, primarily in favor of younger, male employees, Ms. Fryer continued to perform her duties in an excellent manner.

44.  Ms. Fryer's outstanding performance was routinely recognized through annual incentive awards and retention grants.

45.  Ms. Fryer was rated a "2" (Exceeds Expectations) on a scale of "1" to "5" (with "1" being the highest rating) on her annual performance reviews for 2010, 2011 and 2012.  In 2013 and 2014, Ms. Fryer achieved a rating of "1" (Significantly Exceeds Expectations).

46.  Ms. Fryer's team, and responsibilities, continued to expand, and she continued to inquire about promotion to a higher level position within the company.

47.  Despite her requests, Ms. Fryer was not promoted.

48.   Ms. Fryer served as Interim Treasurer reporting directly to CFO Upadhyay in the second half of 2014 when Mr. Saik vacated the position.

49.   In late 2014, Ms. Fryer was selected to receive the President's Award – the most distinguished award at Endo – given to the top 10 employees out of approximately 5,000 worldwide in recognition of their outstanding performance.

50.   Ms. Fryer is aware that she received the award in large part due to her seamless coverage of the Interim Treasurer role while the company searched for a suitable replacement candidate at a time when Endo acquired a very large company that was financed with debt.

51.   Despite exemplary performance in the interim role, Ms. Fryer was told that she was not permitted to fill the Treasurer role.

52.   Also in late 2014, Mr. Upadhyay informed Ms. Fryer that she would be promoted to the Vice President level during the annual promotion cycle that typically took place in March.

53.   Colleagues confirmed that Ms. Fryer's promotion to Vice President was included in the annual budget prepared in Q4 2014.

54.   In or around August of 2014, Larry Smith was hired as Senior Vice President of Tax.

55.   Mr. Smith indicated a discriminatory animus against older workers, commenting that some employees were "too old", "too stuck in their ways to contribute to the rapidly changing organization", and "resisted change because they were too old".

56.   Despite multiple complaints to Mr. Upadhyay and Human Resources, nothing was done to address the discriminatory and harassing ageist comments and conduct of Mr. Smith.

57.   Mr. Smith specifically targeted Ms. Fryer on a number of occasions as a result of her age, including making false, negative comments both internally at Endo and to individuals outside of the company.

58.  Ms. Fryer complained to Mr. Upadhyay and to Vito Romano of Endo's Human Resources Department on several occasions, but her complaints were never addressed.

59.  In or around January 2015, Endo hired Karen Wallace to serve as its Senior Vice President and Treasurer.

60.  In this role, Ms. Wallace was Fryer's supervisor.

61.  In one of her introductory meetings with Fryer, Ms. Wallace openly displayed a discriminatory animus against women, explaining to Ms. Fryer that she "does not like to work with women" and that she "knew that two strong females could not work together."

62.  Ms. Wallace soon began taking steps to undermine Ms. Fryer's performance, intervened to take away a promotion that Ms. Fryer had already been selected for, and actively promoted and rewarded young, male employees on the Treasury team, despite the fact that she denied Ms. Fryer the opportunity for advancement.

63.  At Fryer's next mid-year review, in August 2015, Ms. Wallace gave Fryer a negative performance review—the first in her career with Endo—and advised Fryer that she would no longer be promoted as promised.

64.  Ms. Wallace provided conflicting and contradictory reasons for the denial of the promotion.  First, Ms. Wallace indicated that the promotion was denied because Ms. Fryer's position description did not support a Vice President level.  When Ms. Fryer pointed out that her job responsibilities and workload had increased tremendously over time, Ms. Wallace indicated that this was not justification for a promotion.  The next day, Ms. Wallace indicated that Ms. Fryer was not being promoted because of "development needs" rather than her previous explanation that Ms. Fryer was not promoted because her position description did not support a promotion.  When Ms. Fryer asked if there was

anything she could do to obtain a Vice President level position or to transfer to another department that would provide more opportunities for advancement, Ms. Wallace stated that she would not be supportive of a promotion to Vice President or movement within the company for Ms. Fryer due to her purported developmental needs.

65. Shortly thereafter, Ms. Fryer met with Mr. Upadhyay to address her concerns over Ms. Wallace's decision to prevent her promotion that Mr. Upadhyay had previously promised. Mr. Upadhyay suggested that Ms. Fryer work with Ms. Wallace to address potential areas for improvement and told Ms. Fryer that she "should be happy that [she] is one of the highest paid females within Finance."

66. In or around November 2015, Ms. Fryer noticed that the 2010 Grant no longer appeared in her E*TRADE account.

67. After researching the issue and failing to find a plausible explanation for the disappearance of the 2010 Grant, in or around December 2015, Ms. Fryer reported the fact that the 2010 Grant no longer appeared in her E*TRADE account to Ms. Wallace.

68. Ms. Wallace advised Ms. Fryer to wait until Endo's Corporate Finance Manager returned from maternity leave and instruct the Corporate Finance Manager to re-enter the stock option grant.

69. Ms. Wallace explained to Ms. Fryer that she would not be further harmed by the delay because the Q4 2015 restricted trading window would be in effect and, as a result, Ms. Fryer would not have been able to exercise the options anyway.

70. Ms. Wallace also commented that it would "not look good" if Ms. Fryer re-entered the missing 2010 Grant herself.

71. As instructed, Ms. Fryer waited until the Corporate Finance Manager returned from maternity leave and advised her of the issue in or around January 2016.

72. In or around March 2016, the Corporate Finance Manager resolved the issue by re-entering the 2010 Grant.

73. A number of younger, male colleagues were promoted to Vice President or given opportunities to move to other roles within the company including, among others, Jack Boyle, Chris Degnan, and Rick Casten.

74. Endo's failure to promote Ms. Fryer in favor of younger, male employees continued through 2015, 2016, and 2017.

75. In addition, younger males who were previously promoted to Vice President when Ms. Adler acknowledged that Ms. Fryer was underleveled were now being promoted to Senior Vice President.

76. Continuously, Ms. Fryer complained to Ms. Wallace, Mr. Upadhyay and Human Resources regarding the promotion of younger male employees over Ms. Fryer in the Finance Department despite Ms. Fryer's superior performance ratings.

77. Ms. Fryer also complained that her similarly situated male colleagues in the Finance Department were being paid more for performing similar work under similar conditions.

78. Despite her complaints, Ms. Fryer continued to be passed over for promotion to a higher level, and received less compensation than her similarly situated male counterparts.

79. Ms. Fryer understands that her male colleagues in the Finance Department received significantly larger bonuses than female employees, including Ms. Fryer.

80. In fact, Ms. Wallace actively promoted or gave large pay increases to young males in the Finance Department who reported to Ms. Fryer.

81.   Ms. Wallace worked directly with Human Resources to have such changes implemented, bypassing the regular process whereby an employee's direct manager recommends such changes.

82.   Ms. Fryer did not learn of these changes until they were approved by management.

83.   On a regular basis, Ms. Wallace made negative comments evidencing an animus against women, made comments that suggested she held an animus against Ms. Fryer because of her age such as commenting on Ms. Fryer's inability to change due to her age, and took other negative actions against Ms. Fryer due to her gender and age.

84.   Ms. Wallace even indicated that she was in attendance at a meeting where Mr. Smith made derogatory comments about Ms. Fryer's age and abilities, but when Ms. Fryer asked how Ms. Wallace had reacted, Ms. Wallace explained that "Larry is just Larry."

85.   Ms. Fryer continued to complain to Human Resources and other members of management to no avail.

86.   Instead, Ms. Wallace and Endo retaliated against Ms. Fryer for daring to raise her complaints.

87.   Ms. Wallace, among other retaliatory actions, usurped a number of Ms. Fryer's job duties as her own, advised Ms. Fryer's subordinates to bypass Ms. Fryer and come directly to Ms. Wallace with any issues, otherwise undermined Ms. Fryer's authority and caused chaos and frustration among Ms. Fryer's team members.

88.   Ms. Wallace stated to Ms. Fryer that other members of the department were "experts" and Ms. Fryer's supervision was no longer needed, indicating that Ms. Fryer had been at Endo too long, and was engrained in "old" processes and resistant to change.

89.   Ms. Wallace actively discouraged Ms. Fryer from reporting any of the harassing conduct, indicating to Ms. Fryer that Ms. Wallace had received agreement from management and Ms. Fryer's peers regarding the negative, hostile and ageist feedback she was provided.

90.   In March of 2016, Ms. Wallace continued her pattern of discriminatory, harassing and retaliatory behavior against Ms. Fryer.

91.   At Ms. Fryer's 2015 annual review, which took place in March 2016, Ms. Wallace indicated that some of Ms. Fryer's alleged shortcomings directly related to her status as a woman.  Indeed, Ms. Wallace indicated that Fryer was "unapproachable" and "bitchy."

92.   When Ms. Fryer confronted Ms. Wallace regarding the undeserved 3 rating, Ms. Wallace, incredibly, indicated that what mattered was not the quality or quantity of Ms. Fryer's work, but "how" she did the work.

93.   This comment was particularly unbelievable because Ms. Fryer is aware that others within the Finance Department received significant bonuses and even promotions as rewards for the volume of work completed.

94.   When Ms. Fryer asked Ms. Wallace if the inexplicable 3 rating was connected to her complaints about discriminatory practices including unequal pay and promotional practices, Ms. Wallace indicated that Ms. Fryer should be happy that she received any bonus at all.

95.   Upon further investigation, Ms. Fryer learned that she was the first employee in the history of the Finance Department to go from being rated a 1 overall on an annual review to a 3 on the following year's review without having been promoted to the next level or terminated.

96.   Given Ms. Wallace's continued discriminatory, harassing and retaliatory behavior, and after now learning that Ms. Wallace was taking the unprecedented act of dropping an

employee from a 1 to a 3 rating, Ms. Fryer again met with Mr. Upadhyay to address her concerns and again raise her complaints about discrimination, harassment and retaliation by both Ms. Wallace and Mr. Smith.

97.   Mr. Upadhyay again indicated that Ms. Fryer should be appreciative that she was the highest paid female Senior Director in Finance, but agreed to raise Ms. Fryer's concerns with Human Resources.

98.   Mr. Upadhyay met with Human Resources Generalist for Finance, Traci Shyer and relayed Ms. Fryer's concerns regarding discrimination, harassment and retaliation, including Ms. Fryer's concerns regarding the discriminatory pay and promotion practices in the Finance Department.

99.   Instead of interviewing Ms. Fryer, Ms. Shyer met with Ms. Wallace and developed a list of ways to improve the relationship between Ms. Wallace and Ms. Fryer.

100.   When Ms. Fryer met with Ms. Wallace, Ms. Wallace indicated that Mr. Upadhyay, Ms. Shyer and Human Resources were in agreement that Ms. Fryer should no longer complain to Human Resources or Mr. Upadhyay, but should instead go only to Ms. Wallace. Despite this attempt to dissuade Ms. Fryer from going to Human Resources with complaints, Ms. Fryer complained to Ms. Shyer regarding, among other things, her unprecedented rating drop from a "1" to a "3".

101.   At one of her next weekly status meetings with Fryer, Ms. Wallace told Ms. Fryer, "I knew having two strong women in the department was going to be an issue."

102.   Thereafter, during 2016, Ms. Wallace continued to undermine Ms. Fryer's performance and take away responsibilities from Ms. Fryer.

103. On or around May 26, 2016, Ms. Fryer was awarded certain retention compensation, which was comprised of a cash award, a stock option grant, and a restricted stock grant (the "2016 Retention Award").

104. After accepting the 2016 Retention Award, Ms. Fryer approached the CFO to discuss the issue.

105. In light of Ms. Wallace's continued efforts to undermine Ms. Fryer and take her responsibilities away, Ms. Fryer expressed concern that she would be driven from the company by Ms. Wallace and requested that the vesting of the stock option grant and the restricted stock grant contained in the 2016 Retention Award be accelerated in the event that she was terminated without cause.

106. The CFO obtained approval for Ms. Fryer's request and presented her with a revised retention award that included accelerated vesting for the stock option grant and restricted stock grant in the event of termination without cause as requested (the "Revised 2016 Retention Award").

107. In or around August 2016, Ms. Wallace gave unusual off-cycle pay increases and/or promotions to two male employees in the department that made them more highly compensated than more experienced female employees.

108. When Ms. Fryer questioned the unusual pay increases and/or promotions and asked about her own status, Ms. Wallace indicated that Ms. Fryer should not look to be promoted within the Treasury Department, or otherwise, until Ms. Wallace left the company.

109. Ms. Wallace also told Ms. Fryer that she was considering another promotion for one of the male employees to the same level as Ms. Fryer, even though the male employee had significantly less experience with Endo in treasury-related functions.

110.   Mr. Upadhyay left the company in November of 2016.

111.   Just prior to his departure, Ms. Fryer met with him to ask his advice on how she should go about seeking advancement within Endo.

112.   Mr. Upadhyay suggested that Ms. Fryer set up a meeting with the incoming CFO, Blaise Coleman.

113.   Mr. Upadhyay acknowledged that Ms. Wallace was not supportive of Ms. Fryer's advancement.

114.   In late 2016, Ms. Fryer met with Mr. Coleman, who indicated only that he would take Ms. Fryer's experience into account in considering her for promotion or movement into another role if there were a reduction in force.

115.   After Mr. Upadhyay's departure, Ms. Wallace demanded that Ms. Fryer not raise any of her concerns with anyone above Ms. Wallace.

116.   In fact, on one occasion, Ms. Wallace stood outside of Ms. Fryer's office and screamed that Ms. Fryer was not to raise any issues with anyone above her again without Ms. Wallace's express approval.

117.   Throughout her employment with Endo, Ms. Fryer observed significant pay disparities between men and women performing equivalent work including significant disparities between the level of pay Ms. Fryer received compared to her male counterparts for equal work on jobs requiring equal skill, effort and responsibility, and performed under similar working conditions.  Further, Ms. Fryer was passed over for promotions for which she was more qualified than her male counterparts, resulting in pay disparities.

118. Ms. Fryer observed that male employees in her department performing equal work on jobs requiring equal skill, effort and responsibility, performed under similar working conditions generally received higher base salaries than their female counterparts, including Ms. Fryer.

119. Ms. Fryer observed that the discrepancies between similarly situated male and female employees in Ms. Fryer's department, including Ms. Fryer, were even more pronounced when the male employees' bonuses were taken into account.  Indeed, male employees in Ms. Fryer's department received much more significant bonuses than their female counterparts.

120. Ms. Fryer calculates, conservatively, that her male counterparts in her department were making on average $25,000 more annually than Ms. Fryer for equal work on jobs requiring equal skill, effort and responsibility, performed under similar working conditions.

121. Ms. Fryer verbally complained to Human Resources about this discriminatory conduct.

122. However, Endo failed to take any remedial action.

123. Instead, despite her documented exemplary performance and in apparent retaliation for her complaints of discrimination and unequal pay, Ms. Fryer was notified on January 26, 2017 that her position was being eliminated in a reduction in force.

124. Ms. Wallace, through her efforts at removing and reassigning Ms. Fryer's job duties, had caused Ms. Fryer's role to seem duplicative and had thus, been the driving force behind causing Ms. Fryer's termination.

125. At that time, Ms. Fryer was presented with a proposed separation agreement and general release.

126. Because she had continued to be subjected to discriminatory, harassing and retaliatory behavior by Endo and Ms. Wallace, and because she had now been terminated and offered

the same standard severance package offered to all the employees laid off as part of the reduction in force, Ms. Fryer engaged an attorney, Joyce L. Collier on January 31, 2017.

127.   On February 2, 2017, Ms. Fryer submitted a written account to Ms. Shyer of a number of her previous complaints and discriminatory, harassing and retaliatory conduct she had been subjected to.

128.   On February 3, 2017, Ms. Fryer was informed via an email from Senior Vice President, Human Resources Karen McGrath that her last day worked would be February 6, 2017.

129.   On February 6, 2017, during a meeting with Ms. Fryer, Ms. McGrath asked if Ms. Fryer would like to discuss her prior complaints regarding the company's unfair treatment.

130.   Ms. Fryer indicated that it was well-documented and therefore she did not need to discuss it further with Ms. McGrath.

131.   Ms. Fryer did, however, indicate her fear that Priyanka Agrawal might become the new target for Ms. Wallace because Ms. Agrawal was the only female left in Treasury and was having challenges with being a new mom.

132.   Ms. Fryer disclosed to Ms. McGrath that Ms. Wallace had already made a number of derogatory comments regarding Ms. Agrawal.

133.   Ms. Fryer requested a copy of her personnel file and was surprised to learn that it contained no documentation regarding any of Ms. Fryer's complaints or Mr. Upadhyay's meeting with Human Resources to relay Ms. Fryer's concerns in March of 2016 or any subsequent actions with respect to that meeting.

134.   During that meeting, Ms. McGrath discussed how Ms. Fryer would receive her final compensation.

135.  At that time, Ms. McGrath advised Ms. Fryer that she could follow up directly with the Corporate Finance Manager if there were any issues with Ms. Fryer's equity compensation upon termination.

136.  Ultimately, Ms. Fryer's counsel negotiated an enhanced severance package with Endo that reflected the valuable consideration Ms. Fryer was providing to the company by agreeing to release her claims for harassment, discrimination, and retaliation.

137.  The Separation Agreement and General Release (the "Separation Agreement") was executed by Ms. Fryer and Ms. McGrath on behalf of Endo on or around March 1, 2017.

138.  Under the terms of the Separation Agreement, Endo agreed to pay Ms. Fryer the following:

a.  Severance pay in the gross amount of $234,927.00;

b.  Her 2016 Annual Incentive Compensation in the gross amount of $73,415.00;

c.  The cash portion of her Revised 2016 Retention Award in the gross amount of $39,155.00;

d.  The company's portion of medical, dental, and vision insurance premiums for up to 10 months; and

e.  The cost for up to 6 months of outplacement services.

139.  In the Separation Agreement, Endo also recognized its obligation, regardless of whether Ms. Fryer signed the Separation Agreement, to pay her any accrued but unused paid time off ("PTO") as of the Separation date.

140.  At the time it entered into the Separation Agreement, Endo had knowledge of the fact that the 2010 Grant went missing from her E*TRADE account and that Ms. Wallace approved of it being re-entered.

141. At the time it entered into the Separation Agreement, Endo also had possession of a copy of the Revised 2016 Retention Award, which Ms. Fryer had previously delivered to the Corporate Finance Manager on or around February 6, 2017.

142. On March 20, 2017, Ms. McGrath and Endo's Senior Vice President and Associate General Counsel, Douglas Macpherson, who had negotiated the Separation Agreement on behalf of Endo and knew that Ms. Fryer was represented by legal counsel, called Ms. Fryer on her personal cell phone.

143. Mr. Macpherson indicated that they just needed to clarify a few things about Ms. Fryer's stock grants and that the call would only take a few minutes.

144. Mr. Macpherson and Ms. McGrath proceeded to ask Ms. Fryer questions about the 2010 Grant, the Revised 2016 Retention Award, and certain emails between Ms. Fryer and the Corporate Finance Manager.

145. At no time did Mr. Macpherson or Ms. McGrath indicate that they were conducting a formal investigation or suggest that Fryer could have her attorney present.

146. Nor did Mr. Macpherson or Ms. McGrath contact Ms. Fryer's legal counsel for permission to speak with Ms. Fryer outside of her presence.

147. Ms. Fryer responded in good faith to the questions she was asked.

148. Mr. Macpherson and Ms. McGrath both indicated that Ms. Fryer's responses made sense and were satisfactory.

149. However, Mr. Macpherson indicated that from Endo's perspective there was no record of the 2010 Grant or the Revised 2016 Retention Award and stated that Endo would not honor the awards.

150. At the time of this call, the share price for Endo's stock was trading significantly below the strike price for the 2010 Grant and for the option portion of the Revised 2016 Retention Award.

151. The 2010 Grant and the option portion of the Revised 2016 Retention Award were therefore essentially worthless, as Ms. Fryer had never exercised them.

152. By Ms. Fryer's estimation the value of the restricted stock portion of the Revised 2016 Retention Award had been reduced to approximately $28,000 at that time.

153. Recognizing that the option grants were essentially worthless, and weighing the value of the restricted stock portion of the Revised 2016 Retention Award against the cost and burden of fighting Endo over the 2010 Grant and Revised 2016 Retention Award, Ms. Fryer offered that the 2010 Grant and the accelerated vesting of the stock option grant and restricted stock grant portions of the Revised 2016 Retention Award could be cancelled if it resolved the matter.

154. Mr. Macpherson and Ms. McGrath indicated that this was acceptable and would resolve the matter.

155. However, on March 28, 2017, Ms. McGrath sent Ms. Fryer a letter indicating that Endo would not pay the severance payment, cost of benefits, or cost of outplacement services it was obligated to under the terms of the Separation Agreement.

156. Ms. McGrath further indicated that Endo would not pay Ms. Fryer's accrued unused PTO, which had a gross value of $6,989.53.

157. Despite Ms. Fryer's complaints and requests to be paid the earned, but unpaid PTO wages she is due, Endo did not pay any portion of the wages due to Ms. Fryer in the form of earned, but unused PTO until August 2018.

158. Despite Ms. Fryer's complaints and requests to be paid her severance pay in the gross amount of $234,927.00, Endo has not paid any portion of the severance pay due to Ms. Fryer.

159. Further, Endo demanded repayment of the 2016 Annual Incentive Compensation and the cash portion of the Revised 2016 Retention Award that had already been paid, pursuant to the terms of the Separation Agreement.

160. Following her termination, but prior to the initiation of litigation, Endo defamed Ms. Fryer.

161. More specifically, Ms. Fryer has learned that Endo communicated to one or more third parties, including the Pennsylvania Record, that Ms. Fryer embezzled funds from Endo while employed by Endo.

162. Ms. Fryer has also learned that Endo communicated this information to one or more of her co-workers at Endo, including Brian Scheuer, prior to the initiation of litigation against Ms. Fryer.

163. The untruthful, negative information published to third parties, including the Pennsylvania Record and Mr. Scheuer, has damaged Ms. Fryer's reputation and made it more difficult for Ms. Fryer to obtain employment.

164. In or around June of 2017, Ms. Fryer learned that Ms. Wallace received a buyout package from Endo and left the company to work elsewhere.

165. The reason Endo offered Ms. Wallace a buyout package only four months after a reduction in force is unknown.

166. Ms. Wallace was replaced as Treasurer by Mark Bradley, a younger male who was a peer of Ms. Fryer's in 2010 and quickly advanced to the Senior Vice President level in 2016.

167. Approximately 70% of Ms. Fryer's workload should have been absorbed by Ms. Wallace when Ms. Fryer left in February 2017, as there were no other individuals within Treasury with the same extensive experience to absorb her workload.

168. With Ms. Wallace's departure, the bulk of Ms. Fryer's workload and former job duties were effectively transferred to a younger male within Endo.

169. Ms. Fryer has been discriminated against and harassed on the basis of her age and sex, treated differently with respect to pay and promotions on the basis of her age and sex, and retaliated against because of her complaints about this discrimination, harassment, and retaliation, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq., and Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

## **COUNT ONE**

### **Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq.**

170. Ms. Fryer incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

171. Based on the foregoing, Endo has engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

172. In discriminating against and harassing Ms. Fryer because of her sex, and retaliating against her because of her complaints about harassment and discrimination, Endo violated Title VII of the Civil Rights Act of 1964.

173. Said violations were intentional and willful.

174. Said violations warrant the imposition of punitive damages.

175.   As the direct result of the aforesaid unlawful employment practices engaged in by Endo, Ms. Fryer has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon and has incurred attorneys' fees and costs.

## COUNT TWO

### Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.

176.   Ms. Fryer incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

177.   Ms. Fryer is and was at the time of her termination, over forty years of age and an individual within the class protected by the Age Discrimination in Employment Act.

178.   In discriminating against and harassing Ms. Fryer because of her age, and in retaliating against Ms. Fryer because of her complaints about age discrimination and harassment, Endo violated the Age Discrimination in Employment Act.

179.   Endo intentionally and willfully discriminated against and harassed Ms. Fryer because of her age and retaliated against Ms. Fryer because of her complaints about age discrimination and harassment.

180.   As the direct result of the aforesaid unlawful employment practices engaged in by Endo, Ms. Fryer has sustained a loss of earnings, loss of future earning power, as well as back pay, front pay, and interest due thereon.

181.   Endo's willful violations of the ADEA warrant an award of liquidated damages.

182.   As the direct result of the aforesaid unlawful employment practices engaged in by Endo, Ms. Fryer has sustained a loss of earnings, loss of future earning power, as well as back pay, front pay, and interest due thereon and has incurred attorneys' fees and costs.

## PRAYER FOR RELIEF

183.   Ms. Fryer incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

**WHEREFORE**, Cindy Fryer respectfully requests that this Court enter judgment in her favor and against Endo and Order:

 a.   Appropriate equitable relief, including reinstatement or front pay;

 b.   That Endo's actions described herein violated the Age Discrimination in Employment Act and Title VII;

 c.   Endo pay Ms. Fryer compensatory damages and consequential damages;

 d.   Endo compensate Ms. Fryer with the wages and other benefits and emoluments of employment to which she would have been entitled had he not been subjected to unlawful conduct in violation of the Age Discrimination in Employment Act and Title VII;

 e.   Endo pay Ms. Fryer liquidated damages pursuant to the Age Discrimination in Employment Act;

 f.   Endo pay Ms. Fryer compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

 g.   Endo pay Ms. Fryer punitive damages;

 h.   Endo pay prejudgment interest;

 i.   Endo pay Ms. Fryer's attorneys' fees and costs of suit; and

 j.   Such other relief as is deemed just and proper or which is available under the relevant statutes.

## JURY DEMAND

Plaintiff Cindy Fryer hereby demands a jury trial as to all issues so triable.

**BELL & BELL LLP**

By: _James A. Bell IV_____
James A. Bell, IV, Esq.
1617 JFK Blvd., Ste. 1254
Philadelphia, PA 19103
(215) 569-2500
jamesbell@bellandbelllaw.com

*Counsel for Plaintiff*
*Cindy Fryer*

DATED:  August 27, 2018